UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DAVID BUCKHALTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 1:06-cv-0355-DFH-TAB |
| ) | |
| JOANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff David Buckhalter seeks judicial review of the unfavorable portion of a final decision by the Commissioner of Social Security, denying his application for disability insurance benefits after January 1, 2004. Acting for the Commissioner, Administrative Law Judge (ALJ) Albert J. Velasquez determined that Mr. Buckhalter was disabled under the Social Security Act from December 20, 2002 through December 31, 2003. The ALJ also determined that Mr. Buckhalter was no longer disabled from January 1, 2004 through March 24, 2005, finding that he could perform a specified range of light work because certain aspects of his condition had improved. In determining Mr. Buckhalter's residual functional capacity, the ALJ discounted reports from Mr. Buckhalter and his personal physician concerning the ongoing severity of his symptoms. As discussed below, this credibility determination is not supported by substantial

evidence. The ALJ's decision is therefore reversed and remanded for reconsideration consistent with this entry.

*Background*

Before he became disabled in 2002, David Buckhalter earned a high school general equivalency diploma and worked in a variety of jobs over twenty years, including food preparation and service work from 1990 through 2002. R. 184. He never earned more than $25,000 in a single year and often was paid substantially less. R. 142. Mr. Buckhalter was 37 years old in 2005 when the ALJ found he was no longer disabled.

In January 2003, Mr. Buckhalter was admitted to a hospital complaining of chest and abdominal pain. He was diagnosed as HIV positive. R. 23, 187. Over the subsequent months, Mr. Buckhalter sought a variety of medical treatment, including mental health counseling to deal with stress caused by his diagnosis. R. 23-24. Despite this stress, he continued to look for work. R. 217. On May 7, 2003, Dr. Khan of the Wishard Hospital Infectious Disease Clinic wrote a letter stating that Mr. Buckhalter was currently unable to work due to untreated HIV. R. 171. At that time, his CD4 count had reached a low of 51 and his viral load a high of 474,000. R. 125.

Mr. Buckhalter began a course of medication to control the progress of his condition and initially responded well. R. 198-99. As is common in HIV cases,

Mr. Buckhalter experienced a number of complications, drug side effects, and adjustment disorders over the course of his treatment. Mr. Buckhalter received treatment for sleeplessness and depression. R. 25. In October 2003, he was diagnosed with latent tuberculosis (TB) and reported intermittent diarrhea. R. 203. At an examination in December 2003, Mr. Buckhalter reported an episode of shingles, recurrent diarrhea occurring three to four times a week, weakness, fatigue, depression, and social withdrawal. At a psychological examination in January 2004, Mr. Buckhalter reported significant short term memory loss, concentration problems, and suicidal thoughts. Dr. Horton diagnosed Mr. Buckhalter as having suffered from a "major depressive episode, single, moderate." R. 26.

Beginning in April 2004, Mr. Buckhalter visited Midtown Community Mental Health Center for treatment of his increasing depression and for management of his ongoing AIDS and TB conditions. R. 430. On his first visit, Mr. Buckhalter reported ongoing depression, sleeplessness, suicidal thoughts, and diminished self-worth related both to his diagnosis and his dependence on others. Mr. Buckhalter also discussed his inability to work in food service jobs due to frequent episodes of diarrhea and his history of TB. R. 428.

While receiving treatment at Midtown, Mr. Buckhalter pursued his application for disability benefits and became increasingly depressed and frustrated with the results. *Id.* On July 19, 2004, Donna Merritt, R.N., C.N.S.,

wrote a letter for Mr. Buckhalter's disability hearing summarizing his reported and observed symptoms. Ms. Merritt specifically noted fatigue, depression in spite of medication, and feelings of guilt "because of dependence on others." She also reported that Mr. Buckhalter was "frustrated, despondent, and wishe[d] he were dead because of his inability to work." R. 27, 417. Ms. Merritt's letter stated that Mr. Buckhalter suffered from diarrhea that occurred "usually twice a day," worsened when he ate, and was related to his HIV medications. *Id.*

Mr. Buckhalter testified at his first disability hearing before the ALJ on August 2, 2004, and was assisted by representative Nancy Winters. Internist Dr. Nina Smith provided medical testimony. R. 63. Following this hearing, Mr. Buckhalter obtained counsel, who requested further proceedings to include testimony from a vocational expert. R. 111-12.

On October 4, 2004, Dr. April Morrison of the Wishard Clinic saw Mr. Buckhalter and completed a medical assessment form for his benefits application. R. 28. Dr. Morrison reported an improved CD4 count of 302, but also included diagnoses of depression, diarrhea, and fatigue. Dr. Morrison based these diagnoses on Mr. Buckhalter's reports as well as her three treatments of him during 2004. *Id.* As the ALJ noted, Dr. Morrison indicated that during a normal workday, Mr. Buckhalter could sit about four hours and stand less than two hours. She also indicated that Mr. Buckhalter would require four thirty-minute

4

breaks during a workday and would need flexibility to stop work at a moment's notice for a restroom break. *Id.*

Mr. Buckhalter was still experiencing repeated bouts of diarrhea at the time of his second disability hearing before the ALJ on January 27, 2005. R. 29. Medical expert Dr. Paul Boyce and vocational expert Gail Corn testified at that hearing. R. 111-21. The ALJ issued his partially unfavorable ruling on March 24, 2005. R. 42. Because the Appeals Council denied further review, the ALJ's decision is treated as the final decision of the Commissioner. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

*The Disability Standard*

To be eligible for disability insurance benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of no less than twelve months. 42 U.S.C. § 423(d). If a claimant's impairment is listed in Part 404, Appendix 1, Subpart P of the implementing regulations, and if the duration requirement is met, then disability is presumed. 20 C.F.R. § 404.1520(d). Otherwise, a claimant can establish disability only if his impairments are of such severity that he is unable to perform both work that he

5

has previously performed and all other substantial work available in the national economy.  20 C.F.R. §§ 404.1520(f) and (g).

The implementing regulations for the Act provide the familiar five-step process to evaluate a disability claim.  See 20 C.F.R. § 404.1520(a)(4).  The steps are:

(1) Is the claimant currently employed?  If so, he is not disabled.

(2) If not, does the claimant have a severe impairment or combination of impairments?  If not, he is not disabled.

(3) If so, does the impairment meet or equal an impairment listed in the regulations?  If so, the claimant is disabled.

(4) If not, does the claimant retain the residual functional capacity to do his past relevant work?  If so, he is not disabled.

(5) If not, does the claimant retain the residual functional capacity to perform other work in the national economy?  If so, he is not disabled.  If not, he is disabled.

When applying this test, the burden of proof rests on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

*Standard of Review*

If the Commissioner's decision is supported by substantial evidence, it must be upheld by a reviewing court.  42 U.S.C. § 405(g); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999).  Substantial evidence is "such relevant evidence as a

6

reasonable mind might accept as adequate to support a conclusion." *Id.*, quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna*, 22 F.3d at 689. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). The ALJ has a basic obligation to develop a full and fair record, *Nelson*, 131 F.3d at 1235, and must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Sarchet*, 78 F.3d at 307. If the evidence on which the ALJ relied does not support the conclusion, the decision cannot be upheld. *Blakes*, 331 F.3d at 569.

Ordinarily a credibility finding by an ALJ is binding on a reviewing court, unless that finding is based on errors of fact or logic. *Allord v. Barnhart*, 455 F.3d

7

818, 821 (7th Cir. 2006). In making a credibility determination, the ALJ must give specific reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers will have a fair sense of how the claimant's testimony was assessed. Social Security Ruling 96-7p, printed in 61 Fed. Reg. 34483-01, 34486 (1996); *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear . . . the weight the adjudicator gave to the individual's statements and the reasons for that weight."); *Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir. 2002). A remand is required when the ALJ makes credibility findings based on "serious errors in reasoning rather than merely the demeanor of the witness." *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004).

*The ALJ's Disability Determination*

The ALJ found that Mr. Buckhalter satisfied steps one and two of the five-step evaluation process. Mr. Buckhalter had not worked since 2002, and his AIDS and depression constituted severe impairments. R. 40. The ALJ found at step three that Mr. Buckhalter's impairments did not meet and were not equivalent to any specific listing. At step four, the ALJ discounted the credibility of allegations concerning the severity of symptoms after January 1, 2004, and found Mr. Buckhalter capable of performing his past relevant work after that date. R. 40-41. Contrary to the prior assertions of Dr. Morrison, the ALJ found that Mr.

Buckhalter retained the capacity to stand about six hours or sit about six hours in an eight-hour workday. R. 28, 40.

As part of his determination, the ALJ credited vocational expert testimony that although Mr. Buckhalter's limitations prevented him from performing the full range of light unskilled work otherwise allowed by his residual functional capacity, a significant number of jobs remained in the national economy that Mr. Buckhalter could perform. R. 41. The vocational expert and ALJ based this testimony and finding of capacity on the assumption that such jobs would provide "access to a bathroom with an opportunity to change protective undergarments every two hours." R. 41, 120-21. The ALJ therefore found that Mr. Buckhalter was not disabled under the Act after January 1, 2004. R. 42. It is this portion of the determination that Mr. Buckhalter challenges here.

*Discussion*

Mr. Buckhalter argues that the ALJ unreasonably evaluated the severity and effect of his diarrhea, which was a side effect of the life-saving medication he was taking. The ALJ rejected reports from Mr. Buckhalter, registered nurse Donna Merritt, and Dr. Morrison concerning the severity of Mr. Buckhalter's diarrhea, finding that they were not entirely credible. R. 32-34. This credibility determination was central to the ultimate decision denying benefits after December 31, 2003. The court finds that the ALJ's credibility analysis contained serious errors in reasoning, and is not supported by substantial evidence. The

9

ALJ noted that Mr. Buckhalter "might satisfy the criteria of Listing 14.08I" based on Dr. Morrison's report of January 31, 2005. R. 34. If so, the ALJ could have found Mr. Buckhalter disabled at step three. The ALJ's decision to discredit Dr. Morrison's report determined the outcome at this step. In addition, the ALJ's decision to discount Mr. Buckhalter's and Ms. Merritt's reports influenced his findings concerning severity of impairment and residual functional capacity at step four. R. 33.

The ALJ's conclusions regarding both Mr. Buckhalter's capacity and the number of jobs available to him at step five were based in part on the testimony of vocational expert Gail Corn. R. 39. At the second disability hearing, the ALJ asked about a hypothetical person capable of light and sedentary work but also requiring access to a restroom every two hours to change protective undergarments. R. 120. Ms. Corn responded that such a person could perform some of Mr. Buckhalter's past jobs and some other light and sedentary jobs. R. 121. On cross-examination, Mr. Buckhalter's attorney asked about a further limitation requiring multiple unscheduled restroom breaks. Ms. Corn responded that such a limitation would probably preclude all of the jobs just mentioned. *Id.*

The ALJ did not credit Mr. Buckhalter's and Dr. Morrison's reports concerning his inconsistently controlled and unpredictable explosive diarrhea that occurred as often as two or three times a day. If those reports were accurate, the ALJ's two hour schedule of restroom breaks would not be supported by Ms. Corn's

testimony. By expecting Mr. Buckhalter to work on a set break schedule, the ALJ would be inevitably forcing him to work in soiled undergarments, smelling and feeling unpleasant, and repeatedly asking the boss for permission to make an exception to the break rules so that he could go and clean himself up. Pl. Br. at 11-12. It would not be reasonable to expect Mr. Buckhalter to work under these conditions, or for an employer to employ him under these conditions (especially in the food service industry). The ALJ's disbelief in the current severity of Mr. Buckhalter's symptoms therefore must have been central to his finding that protective undergarments and breaks at two hour intervals would be an appropriate accommodation, just as it was central to his determination that Mr. Buckhalter did not meet a specified Listing.

A reviewing court must reverse where the opinion of the ALJ "contains a substantial number of illogical or erroneous statements that bear materially on [a] conclusion." *Sarchet*, 78 F.3d at 307. Courts must also refuse to credit "unfounded sociological speculations which bespeak a lack of imagination concerning the lives of the many people who apply for social security disability benefits." *Id.* at 308. Here, the ALJ noted an occasion where Mr. Buckhalter refused some treatment and inferred from this that he was "attempting to worsen his symptoms." R. 31. This inference is illogical. TB is an opportunistic infection that ultimately kills approximately one third of AIDS patients worldwide. See *The Deadly Intersection Between TB and HIV* (Nov. 1999), http://www.cdc.gov/hiv/resources/factsheets/hivtb.htm (last visited March 9,

11

2007).  The ALJ's opinion seems to suggest that Mr. Buckhalter was knowingly attempting to activate his latent TB.  This suggestion seems inconsistent with the ALJ's finding that Mr. Buckhalter had "no active suicidal ideation."  R. 28.

In support of his assumption about Mr. Buckhalter's motives, the ALJ made at least one substantive misreading of the record, concerning a treatment note that the ALJ read to say "claimant stated an intention not to return for medical treatment pending his disability hearing."  R. 29.  The actual treatment note reads:

> Focus of session was review of client recent experiences of disrupted WHS services [with] feelings of anger [and] stated inention [sic] to not return for medical treatment, pending disability hearing [with] required MI assessment documentation to be completed by CNS, D. Merritt, *and* continued intentions to move to Atlanta subject to hearing results [and] potential financial support.

R. 481 (emphasis added).  The ALJ's paraphrase leaves out the comma between the clause concerning stated intentions and the clause concerning Mr. Buckhalter's pending hearing.  In contrast, a straightforward reading of the admittedly imperfect sentence, noting the emphasized "and" with the preceding comma, strongly suggests that the writer intended a comma-separated list of three items that were the focus of the session; namely disrupted health services, the pending hearing, and continued intentions to move.  See *The Chicago Manual of Style* § 6.32 (15th ed. 2003).  This reading suggests that Mr. Buckhalter's treatment disruption was related to his feelings of anger, while the ALJ's reading

12

suggests the disruption was related to the pending hearing. Only the latter, less plausible reading supports the ALJ's improbable suggestion that Mr. Buckhalter was attempting to worsen his potentially deadly condition.

The ALJ also noted evidence in the record that Mr. Buckhalter was angry at delays in the disability process, R. 32, and stated a preference against working. R. 31. From these statements the ALJ inferred that "the claimant does not want to work, but can if he must." *Id.* That inference bears more resemblance to a sociological speculation about the motivations of certain applicants than to a standard for determining disability. By applying for disability benefits, all claimants necessarily express a preference for obtaining benefits over working under the difficult, embarrassing, painful, and even dangerous conditions their impairments may create. Mr. Buckhalter grew frustrated with the lengthy application process. He may have been willing to struggle and risk working while disabled in order to avoid starvation and homelessness. These common facts are not relevant to determining disabled status or to the question of any claimant's willingness to act deceptively. The Act and accompanying regulations determine who *can* work and who is disabled. A claimant's wish to "create a record of symptoms which would qualify for disability benefits" does not itself suggest that the claimant is lying about experiencing those symptoms. R. 32.

The opinion also includes illogical reasoning with regard to Mr. Buckhalter's diarrhea. The ALJ stated that riding the bus to and from hearings and medical

13

appointments was inconsistent with Mr. Buckhalter's reports of unpredictable bouts of diarrhea. R. 31-32. The opinion is not clear about how Mr. Buckhalter would otherwise seek treatment and attend hearings. In fact, the record suggests a reason why Mr. Buckhalter was able to get through his hearing without incident. R. 100 (testifying that he had first been vomiting and then not eating because of nerves prior to the hearing). The record also contains evidence that he was not always so successful. R. 99-100 (describing two attacks of diarrhea that delayed his last medical appointment while he cleaned himself in the bathroom).

Mr. Buckhalter's occasional use of the bus to seek treatment for his symptoms does not suggest that he is exaggerating those symptoms. Ability to ride the bus also does not itself suggest ability to work. An ALJ must "consider the difference between a person's being able to engage in sporadic physical activities and [his] being able to work eight hours a day five consecutive days of the week." *Carradine*, 360 F.3d at 755.

The ALJ made a problematic citation to objective medical evidence that allegedly contradicted the reported severity of Mr. Buckhalter's diarrhea. Mr. Buckhalter's CD4 count improved in response to his treatment regimen during the period preceding his disability hearing, and the ALJ believed this improvement was inconsistent with reports about the severity of his diarrhea and other symptoms. R. 31, 37. This would be reasonable if Mr. Buckhalter's diarrhea were related to his low CD4 count or his HIV generally. If the diarrhea were a side

effect of the very drugs that he must continue to take to control the progress of his HIV, however, it might obviously continue unabated.  Both Ms. Merritt and Dr. Morrison indicated that Mr. Buckhalter's diarrhea stemmed from his HIV medication.  R. 27-28.

Mr. Buckhalter's CD4 count was dangerously low after his diagnosis, R. 125, reached a high of 302 before the second hearing, R. 494, and had apparently declined again more recently, R. 504.  His doctors have consistently noted symptoms of diarrhea, which has "inconsistently responded to empiric treatment with loperamide."  R. 496.

The ALJ discounted the credibility of Ms. Merritt's and Dr. Morrison's reports concerning severity of symptoms, incorporating his determinations about Mr. Buckhalter's credibility by noting that the medical reports relied somewhat on subjective statements from Mr. Buckhalter.  R. 32.  It is not likely that doctors and nurses would prescribe drugs and continually track Mr. Buckhalter's diarrhea without satisfying themselves as to the veracity of his reports.  See *Carradine*, 360 F.3d at 755 ("Such an inference would amount to an accusation that the medical workers who treated [claimant] were behaving unprofessionally.").  There is no evidence in the administrative record to suggest that the reports of Ms. Merritt and Dr. Morrison contained anything less than their best medical judgments.

In considering the medical evidence, more weight is generally accorded to physicians and others who have examined or treated a claimant.  See 20 C.F.R. § 404.1527(d); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.").  Here, the ALJ gave reasons for discrediting the treatment reports and relying on the hearing testimony of Dr. Boyce.  R. 34, 37-38.  All of these reasons appear however to relate to one or more of the flawed rationales detailed above.

The ALJ believed that Mr. Buckhalter's increased CD4 count contradicted Dr. Morrison's assessment of the severity of his diarrhea.  R. 37.  An ALJ may not substitute his own layman's medical judgment for a physician's judgment about a *medical* issue.  *Clifford*, 227 F.3d at 870; see also *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("as this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings").  Lawyers may recognize a certain appeal to assessing total health according to a single numerical objective criteria, but this is not how doctors practice their profession.

In view of this non-exclusive list of "serious errors in reasoning," *Carradine*, 360 F.3d at 754, this court is unable to discern a logical bridge between the credibility determinations of the ALJ and substantial evidence in the record.  Most important, the record discloses no support for the improbable inference that Mr.

16

Buckhalter might have been attempting to worsen his symptoms (and thus risking his life) by refusing his TB medication. The record also contains no support for the ALJ's assumptions that Mr. Buckhalter's frustration and desire for disability benefits translated into deceptive purpose, or that medical professionals were participating in a deception concerning the severity of Mr. Buckhalter's symptoms.

When the decision of an ALJ is "unreliable because of serious mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion, in which event a remand would be pointless." *Sarchet*, 78 F.3d at 308-09. The errors in this case were not harmless. On this record, a reasonable trier of fact could have come to a different conclusion. Therefore, this court must reverse the ALJ's decision and remand for further consideration.

*Conclusion*

The decision of the ALJ is reversed and remanded for reconsideration consistent with this entry. On remand, all steps of the five-step sequential process are subject to reconsideration. Final judgment shall be entered consistent with this entry.

So ordered.

Date:  March 12, 2007

                                                DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

J. Frank Hanley II
lawoffices@jfrankhanley.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov